CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

JUN 17 2008

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

|  |  |  |
|---|---|---|
| **BRENDA BOWEN,** | ) | |
| Plaintiff, | ) | Civil Action No: 1:07cv00082 |
| | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | BY: GLEN M. WILLIAMS |
| Defendant. | ) | SENIOR UNITED STATES DISTRICT JUDGE |
| | ) | |

In this social security case, the court affirms the final decision of the Commissioner denying benefits.

### I. Background and Standard of Review

The plaintiff, Brenda Bowen, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Bowen's claims for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517

1

(4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Bowen protectively filed her application for SSI on or about September 23, 2004, alleging disability as of September 15, 2004, based on a discogenic/degenerative back disorder and asthma. (Record, ("R."), at 70, 89-93, 104.) The claim was denied initially and upon reconsideration. (R. 70-71, 82-84.) Bowen then timely requested a hearing before an administrative law judge, ("ALJ"), on May 28, 2005. (R. at 85.) The ALJ held a hearing on August 15, 2006, at which Bowen was represented by counsel. (R. at 31-69.)

By decision dated May 24, 2007, the ALJ denied Bowen's claim. (R. at 13-25.) After consideration of the entire record, the ALJ found that Bowen had not engaged in substantial gainful activity since her alleged onset of disability. (R. at 24.) The ALJ found that the medical evidence established that Bowen had severe impairments, namely degenerative disc disease with lumbar fusion and migraine headaches, but he also found that Bowen's medically determinable impairments did not meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 24.) The ALJ concluded that Bowen's allegations regarding her limitations were not entirely credible. (R. at 24.) Furthermore, the ALJ determined that Bowen retained the residual functional capacity to perform a significant range of

2

light[1] work that did not involve exposure to hazards and did not require climbing ladders, ropes or scaffolds. (R. at 24.) The ALJ also found that the limitations imposed by Bowen's impairments might not preclude performances of her past relevant work as a waitress or photo processor, but that her past relevant work skills were not transferable to other jobs within her residual functional capacity. (R. at 24.) Based on Bowen's age, education and work history, and using Medical Vocational Rule 202.21, 20 C.F.R. Part 404, Subpart P, Appendix 2, as a framework for his decision, the ALJ found that Bowen was capable of performing a significant number of jobs existing in the national economy, such as a cashier, assembler and/or mail clerk. (R. at 25.) Based on these findings, the ALJ determined that Bowen was not under a "disability" as defined by the Act and, thus, was not eligible for SSI benefits. (R. at 25.) *See* 20 C.F.R. § 416.920(g) (2007).

After the ALJ issued his decision, Bowen pursued her administrative appeals, (R. at 8.), but the Appeals Council denied her request for review. (R. at 5-7.) Bowen then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2007). The case is before this court on Bowen's motion for summary judgment filed April 16, 2008, and on the Commissioner's motion for summary judgment filed May 16, 2008.

---

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2007).

3

## II. Facts

Bowen was born in 1972, (R. at 71), which classifies her as a "younger person" under 20 C.F.R. § 416.963(c). Bowen has a high school education, (R. at 40-41), has training as a certified nursing assistant, (R. at 41), has obtained a commercial driver's license, (R. at 41), and has past relevant work experience as a van driver, waitress, certified nursing assistant, landscaper and a day care worker. (R. at 18, 41-42.)

At the August 2006 hearing before the ALJ, Bowen testified that in August 2004 she injured her back and her leg while transporting a rotor tiller from a shed to a garden. (R. at 42.) Bowen testified that the rotor tiller became entangled in her shoelaces and drug her down a hill. (R. at 42.) Bowen testified that she underwent surgery in January 2005 for her injury and that since that time her pain has averaged from five to nine on a 10-point scale. (R. at 43.) She stated that since her surgery, she has experienced stiffness in the morning, and she has been forced to depend on her son to help perform chores around her house. (R. at 43.) She reported that her eight-year-old son helped her do the laundry and shop for groceries. (R. at 44-45.) She also testified that she could no longer perform yard work. (R. at 45.) She stated that her pain was exacerbated by long periods of walking, standing and/or sitting. (R. at 43.) Bowen further testified that she could sit, walk and/or stand for up to 30 to 40 minutes at a time on a good day and for up to 10 to 15 minutes at a time on a bad day. (R. at 43-44.) She testified that, in order to relieve her pain, she rested on the couch or on the bed for an average of four to five hours a day and took Tramadol and Naprosyn to help manage her pain. (R. at 44.) She also reported that she sat in a recliner to help relieve her pain. (R. at 46.)

4

Bowen further testified that her pain made her unable to tolerate her son or others and it caused her to eat and sleep less. (R. at 46-47.) She stated that because of her pain, she no longer laughed and giggled, told jokes or danced around the room when the radio was playing. (R. at 47.) She reported that she was unable to concentrate and often became angered because of her pain. (R. at 47.) Bowen also stated that she began to be depressed about two months after her surgery. (R. at 48.)

Bowen testified that she lived with a friend and his two older children, and indicated that the children performed most of the food preparation and cooking. (R. at 49.) She testified that she had no hobbies, but that she watched a lot of television. (R. at 49-50.) Bowen further reported that Dr. Stephen A. Grubb restricted her from lifting anything heavier than a gallon of milk, and also restricted her from bending, stooping, running and/or hopping. (R. at 51.) She testified that she still drives but does not have a handicap parking sticker, because she was told she was not able to obtain one. (R. at 51.) She further noted that she drives to see friends about every two weeks and that most of her driving entails short distances. (R. at 53-54.) She stated that the two hour ride to her hearing caused pain and was uncomfortable. (R. at 54.)

Bowen testified that she smoked about a pack and a half of cigarettes a day, and that her pain has affected her ability to quit smoking. (R. at 52, 54.) She also testified that she could only walk about half the length of a football field, and that her pain interfered with her ability to watch a movie. (R. at 55.) She testified that she sought mental health treatment, but refused to attend therapy after the initial evaluation because, "[she] refuse[d] to talk about things that have happened in [her] past that are nobody's business . . . ." (R. at 57.)

5

Robert Jackson, a vocational expert, also was present and testified at Bowen's hearing. (R. at 58-68.) Jackson testified that Bowen's past relevant work as a van driver, waitress and photo processor was classified as light and semiskilled work; that her work as a certified nursing assistant was classified as medium[2] and semiskilled work; and that her work as a landscaper and daycare worker was classified as medium and unskilled work. (R. at 61-62.) Jackson was asked to assume a hypothetical individual who had the same age, education and past work experience as Bowen, and who had the residual functional capacity to occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds and who could stand, sit and/or walk with normal breaks for a total of about six hours in a typical eight-hour workday. (R. at 63.) In addition, he was asked to assume that the individual had no limitation on pushing or pulling, could occasionally climb ramps and/or stairs, balance, stoop, kneel, crouch and/or crawl, but could never climb ladders, ropes or scaffolds and that the individual should avoid working around hazards such as dangerous machinery or unprotected heights. (R. at 63.) Jackson testified that such an individual could perform work as a photo processor, waitress, assembler, mail clerk and cashier. (R. at 64.) He testified that work as an assembler, mail clerk and cashier are classified as light and unskilled work. (R. at 64.) Jackson also was asked to assume if absenteeism of two days a month, difficulty in maintaining attention to detail, production pace and concentration, difficulty in dealing with people and/or moderately severe pain would affect the hypothetical individual's ability to work. (R. at 66-67.) Jackson reported that all these factors would considerably limit the hypothetical

---

[2]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting of items weighing up to 25 pounds. If an individual can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. § 416.967(c) (2007).

Case 1:07-cv-00082-GMW-PMS   Document 14   Filed 06/17/08   Page 6 of 37   Pageid#: 634

individual's ability to maintain employment. (R. at 66-67.)

In rendering his decision, the ALJ reviewed records from Dr. Donald R. Williams, M.D., a state agency physician; Alleghany Memorial Hospital; Wake Forest University Medical Center; Dr. Jacob A. Jones, M.D.; Dr. John Peter Birkedal, M.D.; Virginia Highlands Orthopaedic Spine Center; Dr. Stephen A. Grubb, M.D.; Dr. Michael J. Hartman, M.D., a state agency physician; Dr. Richard M. Surrusco, M.D., a state agency physician; Wythe County Community Hospital; Grayson Highlands Family Medicine; Dr. Mary Beres, M.D.; Carillion Neurosurgical Care; and Dr. John C. Fraser, M.D.

After the hearing, Bowen's attorney submitted additional medical evidence from Dr. John Kavacich, M.D.; Front Royal Family Practice; Dr. Anne DeLanoy, M.D.; Department of Neurological Surgery at the University of Virginia; Dr. Huntington T. Hapworth, M.D.; Dr. Robert B. Goldstein, M.D.; Dr. William J. Elias, M.D.; and Brian E. Warren, Ph.D., a licensed clinical psychologist.[3]

Bowen presented to Grayson Highlands Family Medicine from April 7, 2004, through February 21, 2005. (R. at 376-84.) On April 7, 2004, Bowen complained of having headaches for three weeks, "cramping in [her] back" and a "lump in [her] neck." (R. at 382.) Dr. Mary Beres, M.D, prescribed Flexeril and Vicodin. (R. at 382.) A diagnostic imaging report dated April 8, 2004, from Twin County Regional Hospital,

---

[3]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 5-7), this court also will consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

Case 1:07-cv-00082-GMW-PMS   Document 14   Filed 06/17/08   Page 7 of 37   Pageid#: 635

revealed that Bowen had prominent perivascular cerebrospinal fluid spaces and was otherwise negative. (R. at 450.)

On April 20, 2004, Bowen complained that Vicodin made her tired, and she was prescribed Depakote for her frequent migraines. (R. at 381.) On June 17, 2004, Bowen reported that she did not keep her appointment with the neurologist, and informed Dr. Beres that she no longer wanted to take Depakote. (R. at 380.) She also denied any recent headaches and stated that she had no interest in taking any medication at that time. (R. at 380.) On September 16, 2004, Bowen reported that her back pain increased after she fell down the stairs. (R. at 379.) Dr. Beres noted that Bowen's presentation was atypical for a person who complained of lower back pain. (R. at 379.)

Bowen presented to the emergency room, ("ER"), at the Alleghany Memorial Hospital September 19, 2004, with complaints of back pain. (R. at 195-201.) She stated that she had been injured about a month prior to her visit. (R. at 195.) Bowen described her pain as severe and burning, and she also reported that she was unable to bend and/or sit up. (R. at 196.) Bowen was noted to be moderately distressed. (R. at 197.) An x-ray of the lumbar spine revealed bilateral spondylosis at the L5 level of the spine with first-degree spondylolisthesis at the L5-S1 levels of the spine. (R. at 201.) Also, mild narrowing of the intervertebral disc space at the L5-S1 levels of the spine was noted. (R. at 201.) Bowen was diagnosed with a compression fracture at the L5 level of the spine and subluxation at L5-S1. (R. at 195.)

Bowen returned to the ER at the Alleghany Memorial Hospital September 21, 2004, with complaints of loss of feeling and back pain. (R. at 183-192.) Bowen was

8

noted to be in mild distress and was unable to walk. (R. at 185-86.) A neurological examination revealed 5/5 muscle strength in her left extremities and 4/5 muscle strength in her right extremities. (R. at 186.) The examination also revealed pain upon palpation over the L4 and L5 levels of her spine. (R. at 186.) It was reported that Bowen was anxious and crying. (R. at 188.) Bowen was transferred from Alleghany Memorial Hospital due to the lack of a magnetic resonance imaging, ("MRI"), machine or neurosurgery services. (R. at 191.)

Bowen reported to the ER at Wake Forest University Medical Center on September 21, 2004. (R. at 173-80.) She informed the ER staff that she had been "dragged by a rotor tiller down her driveway approximately four weeks [prior to her visit,] after her shoelace became caught in [the] tiller." (R. at 174.) She also informed the ER staff that she was seen at the Alleghany Memorial Hospital ER two days prior, and that an x-ray at that time revealed a fracture of the L4 level of the spine. (R. at 174.) Bowen reported a sudden loss of sensation and decreased strength in her right lower extremity and minimal loss of sensation in her left lower extremity. (R. at 174.) A neurological exam revealed that her cranial nerves II-XII were intact, that her motor strength was normal in her upper extremities and 4+/5 in her right lower extremity, proximally and distally. (R. at 175.) The examination also revealed that sensation in her left lower extremity was decreased to light touch and no sensation to light touch was found in her right lower extremity. (R. at 175.) Her patellar and Achilles reflex decreased bilaterally. (R. at 175.) Dr. Jacob A. Jones, M.D., found that Bowen's MRI did not reveal a lumbosacral spine fracture, but that it was consistent with a pars defect of congenital nature, which caused severe neural foraminal narrowing on the right side. (R. at 176.) Bowen was admitted to the hospital for pain control based on the

9

recommendation of the orthopedics department. (R. at 176.)

On September 22, 2004, Dr. John Peter Birkedal, M.D., reported that Bowen had normal coordination but that she was non-ambulatory. (R. at 179.) A musculoskeletal examination of the bilateral lower extremities demonstrated a decreased range of motion secondary to pain and decreased muscle strength and tone secondary to pain, but revealed no evidence of dislocation, subluxation or laxity. (R. at 179.) Dr. Birkedal reported that an MRI of the cervical, thoracic and lumbar spine revealed no acute fracture of the L4 level of the spine, but noted that the MRI revealed a pars defect at the L5-S1 levels of the spine, bilaterally, which resulted in a Grade I to Grade II anterolisthesis. (R. at 179.) He also reported that there was a bilateral foraminal stenosis at the L5 level of the spine. (R. at 179.) Dr. Birkedal determined that her L5-S1 spondylolisthesis had been aggravated by her traumatic event, and that she required hospitalization for pain management and mobility training with physical therapy. (R. at 179.)

Bowen presented to the Virginia Highlands Orthopaedic Spine Center, ("VHOSC"), on October 5, 2004, for an initial evaluation. (R. at 226-29.) Bowen reported low back and bilateral leg pain, as a result of two accidents. (R. at 226.) She reported that she fell down a flight of steps in January 2004 and that she was dragged down a hill by a tiller in August 2004. (R. at 226.) Bowen informed Dr. Stephen A. Grubb, M.D., that she had a fracture at the L4, L5 and L6 levels of the spine. (R. at 226.) She reported pain in her lower back and numbness from her waist down to her feet, which she stated was aggravated by sitting, standing, walking for an extending period, lifting, bending, changing positions and getting in and out of a car. (R. at 226.)

10

She reported that lying down and taking pain medication alleviated her pain. (R. at 226.) Bowen also reported that she had been diagnosed with hypoglycemia. (R. at 227.) She further reported extremity muscle weakness in both her legs, and that she was numb from her waist down. (R. at 227.) Bowen reported that her pain caused marked interference in all of her leisure and normal household activities, and that she slept less than six hours a night. (R. at 227.)

Dr. Grubb noted that Bowen was alert and oriented and had a normal affect. (R. at 228.) His physical examination revealed normal strength in Bowen's lower extremities, normal range of motion and no significant tenderness. (R. at 228.) A lower back examination revealed normal stance, exaggerated lordosis, increased kyphosis or scoliosis, a spastic gait, limited flexion and extension, tenderness over the midline at the entire lumbar spine, moderate paraspinal muscle spasms and normal upper and lower extremity reflexes. (R. at 228.) X-rays of the lumbar spine revealed mild disc space narrowing at the L4-L5 levels of the spine and moderately severe disc space narrowing at the L5-S1 levels of the spine. (R. at 228.) The x-rays also revealed a bilateral pars defect at the L5 level of the spine, evidence of spondylolisthesis at the L5-S1 levels of the spine and evidence of mild right lumbar scoliosis and a decrease in kyphosis. (R. at 229.) Dr. Grubb diagnosed Bowen with lumbar degenerative disc disease, discogenic lumbar pain and isthmic lumbar spondylolisthesis. (R. at 229.)

Bowen returned to VHOSC on October 12, 2004, for physical therapy, with continued complaints of lower back pain and lower extremity pain. (R. at 223-24.) Bowen reported that her pain was aggravated by bending, rising, sitting for more than 20 minutes, standing for more than 15 minutes and walking for longer than 30 minutes.

11

(R. at 223.) She also reported that her pain was alleviated by sitting less than 20 minutes, standing less than 15 minutes and walking less than 30 minutes. (R. at 223.) Daniel R. Perry, MPT, reported Bowen's overall function level to be at 50%, and reported that she was only sleeping for two to three hours at night. (R. at 223.) Perry instructed Bowen to assume prone positioning as needed for daily, symptomatic pain control and, if sitting, to utilize a lumbar roll support in a firm chair. (R. at 224.) On October 19, 2004, Bowen returned to Perry for physical therapy, but left before her session, stating that she no longer felt that she would benefit from therapy. (R. at 225.)

On November 18, 2004, Bowen continued to complain of lower back and bilateral leg pain. (R. at 221-22.) Dr. Grubb noted that Bowen did not comply with her physical therapy appointment. (R. at 221.) Bowen reported that her worst complaint was lower back pain, and that she experienced numbness from the waist down to her feet. (R. at 221.) She also reported that sitting, standing, walking for an extended period, lifting, bending, changing positions, getting in and out of a car and weather changes aggravated her pain. (R. at 221.) She reported that lying down and taking her medication helped alleviate her pain. (R. at 221.) Dr. Grubb noted that Bowen reported her pain as being 10/10 on a pain level scale, and she also reported that her pain became worse as the day progressed. (R. at 221.) Dr. Grubb also reported that lumbar spine x-rays of October 5, 2004, revealed mild disc space narrowing at the L4-L5 levels of the spine, moderately severe disc space narrowing and spondylolisthesis of a Grade II type at the L5-S1 levels of the spine, bilateral pars defects at the L5 level of the spine and mild right lumbar scoliosis. (R. at 222.) With respect to Bowen's psychiatric review, Dr. Grubb noted that Bowen reported a history of situational depression related to a divorce. (R. at 221.) Bowen was diagnosed with lumbar

12

degenerative disc disease, discogenic lumbar pain and isthmic lumbar spondylolisthesis. (R. at 222.) On December 8, 2004, Bowen underwent a thoracolumbar discogram, which revealed spondylolysis of L5 with second degree spondylolisthesis of L5 on S1, a diffusely degenerated disc at L5-S1 and a posterior tear with possible disc herniation at L4-L5. (R. at 216, 235.)

Bowen returned to VHOSC from January 6, 2005, to June 16, 2005. (R. at 389-417.) On January 6, 2005, Bowen reported significant pain after her discogram, which had diminished slightly. (R. at 415.) Bowen's chief complaints were lower back pain and bilateral leg pain with numbness from her waist down to her feet. (R. at 415-17.) She reported that her back pain was aggravated by sitting, standing, walking for an extended period, lifting, bending and changing positions, getting in and out of a car and changes in the weather. (R. at 415.) She also reported that lying down and taking pain medication helped to alleviate her pain. (R. at 415.) She rated her pain as a six on a 10-point scale and noted that her pain worsened throughout the day. (R. at 415.)

Dr. Grubb noted that Bowen was able to flex forward touching her fingertips to her knees and that flexion was limited by pain. (R. at 416.) He also noted that Bowen had an extension of 20 degrees, which was limited by back pain. (R. at 416.) Bowen also was able to bend laterally to the right and left, and was able to touch her fingertips to within one to two inches from her knees, without significant pain. (R. at 416.) Dr. Grubb noted that Bowen had tenderness over the midline at the L5-S1 levels of the spine. (R. at 416.)

Dr. Grubb noted that a lumbar myelogram and a computerized axial tomography

13

scan, ("CT scan"), taken on December 22, 2004, revealed bilateral spine pars defects at the L5 level of the spine without significant root compression.[4] (R. at 416.) A T12-sacrum discogram and CT scan of December 8, 2004, revealed that the L2-L3 levels of the spine had central posterior peripheralization of dye but an intact outer annulus and tight disc on injection, which was non-painful; that the L4-L5 and L5-S1 levels of the spine were both loose on injection and caused concordant central lower back pain; that the L4 and the L5 level of the spine had a central posterior tear and that the L5-S1 level of the spine was grossly degenerated. (R. at 416.) Dr. Grubb gave a diagnostic impression of lumbar degenerative disc disease, L4-L5 and L5-S1 levels of the spine discogenic lumbar pain and L5-S1 isthmic spondylolisthesis. (R. at 416.) Dr. Grubb reported that the best treatment would be to proceed with an L4 level of the spine sacrum decompression, stabilization and fusion. (R. at 416.) Aside from Bowen's back complaints, Bowen also reported a history of situational depression related to a divorce. (R. at 415.)

Bowen presented to the ER at the Wythe County Community Hospital, ("WCCH"), on January 10, 2005, with chief complaints of back pain and an inability to ambulate. (R. at 430-40.) She also complained of right foot weakness. (R. at 433.) A CT scan was performed on the same date and revealed a Grade I to Grade II anterolisthesis of the L5-S1 levels of the spine, secondary to spondylosis. (R. at 428, 437.) A telephone message from VHOSC dated January 11, 2005, indicated that Bowen had seen Dr. Grubb in the emergency room on January 10, 2005, and Bowen

---

[4]From the record, it appears that Dr. Grubb is referencing an x-ray report from the Wythe County Community Hospital, dated December 22, 2004. (R. at 449.) The report revealed a small right-sided broad-based disc bulge at the L1-L2 levels of the spine and a Grade II anterolisthesis of L5 on S1 secondary to spondylolysis at the L5-S1 levels of the spine. (R. at 449.)

14

was instructed to inform him of any changes in her condition. (R. at 417.) Bowen reported decreased numbness in her legs, but significant pain and difficulty transitioning from positions. (R. at 417.) On January 19, 2005, Bowen presented for a pre-surgery consultation. (R. at 408-10, 414, 417.) Bowen reported that her pain caused marked interference with all of her normal household and leisure activities, and that she slept less than six hours a night. (R. at 408.) Bowen further reported that she had no extremity muscle weakness, pain, tenderness or stiffness and no pain or swelling of her joints. (R. at 409.) She reported numbness and tingling in both of her legs. (R. at 409.) Dr. Grubb noted that she had normal strength in her upper and lower extremities. (R. at 409.) He also found that her motor strength was normal in all four extremities, her deep tendon reflexes were normal and that her coordination was normal. (R. at 409.) Bowen reported asthma, which was controlled by inhalers, and she also reported situational depression related to a divorce. (R. at 408.) Dr. Grubb again diagnosed lumbar degenerative disc disease, L4-L5 and L5-S1 levels of the spine discogenic lumbar pain and L5-S1 isthmic spondylolisthesis. (R. at 409.) He also diagnosed poorly controlled asthma, possible irritable bowel syndrome and congenital nephritic syndrome. (R. at 409.) Dr. Grubb continued to report that the best treatment would be to proceed with an L4 level of the spine sacrum decompression, stabilization and fusion. (R. at 410.)

Dr. Michael J. Hartman, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, ("PRFC"), on January 13, 2005. (R. at 240-46.) Dr. Hartman found that Bowen retained the capacity to occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk with normal breaks for a total of six hours in a typical

15

eight-hour workday and sit for a total of about six hours in a typical eight-hour workday. (R. at 241.) He also found that Bowen had an unlimited ability to push and/or pull. (R. at 241.) Dr. Hartman imposed no postural, manipulative, visual, communicative or environmental limitations. (R. at 301-03.) Dr. Richard M. Surrusco, M.D., another state agency physician, reviewed and affirmed Dr. Hartman's findings on May 12, 2005. (R. at 244.)

Bowen was admitted to WCCH on January 26, 2005, and discharged on January 30, 2005, after undergoing back surgery. (R. at 247-375.) In an initial interview on January 26, 2005, Bowen reported that she had chronic pain in her lower back and pain and numbness that radiated down both of her legs into both feet. (R. at 308.) She also reported that the pain affected her sleep, energy level, ability to work, her moods and ability to recreate. (R. at 309.) Dr. Grubb performed lumbar decompression stabilization with Moss-Miami segmental fixation and an L4 level of the spine sacrum fusion with left intracortical iliac crest bone graft. (R. at 346, 361.) Intraoperative x-rays taken on January 26, 2005, revealed that metal hardware spanning the L4 level of the spine through the upper sacrum appeared intact. (R. at 325, 366.) The x-rays also revealed disc space narrowing and Grade I anterolisthesis at the L5-S1 levels of the spine. (R. at 325, 366.) On the postoperative report form, Dr. Grubb noted that Bowen was stable at the end of the procedure. (R. at 361-62.) Dr. Grubb gave Bowen a postoperative diagnosis of spinal degenerative disc disease with discogenic pain at the L4-L5 and the L5-S1 levels of the spine and isthmic spondylolisthesis at the L5-S1 levels of the spine. (R. at 361.) Bowen underwent physical therapy after the operation and showed improvement. (R. at 276-78.) On a discharge note dated January 30, 2005, Dr. Grubb noted that Bowen had improved postoperatively, and that she had advanced

her physical therapy, diet and occupational therapy. (R. at 367.) He also reported that Bowen was prescribed an albuterol inhaler and a corticosteroid inhaler, and that her lungs had responded very well to these medications. (R. at 367.) Bowen's discharge instructions indicated that she was not to perform any heavy lifting or straining, and that she should not work until otherwise indicated. (R. at 247-48.) However, she was ordered to walk. (R. at 247-48.)

Bowen returned to see Dr. Grubb on February 10, 2005, for her first post-operative follow-up. (R. at 413.) Bowen reported that it was too early to determine whether her surgery was beneficial. (R. at 413.) Bowen complained of lower back aching with shooting pain; bilateral, posterior leg pain and cramping down into her feet. (R. at 413.) Bowen's gait was guarded and slightly crouched. (R. at 403.) She was able to toe walk and able to heel stand, but she was unable to walk on her heels due to pain. (R. at 403.) Tandem walking was slightly unsteady and she had limited extension at the first metatarsophalangeal joints, limiting extension of her great toes. (R. at 403.) A straight leg raise test produced pain in the back of the knees and calf muscles bilaterally. (R. at 403.) Dr. Grubb noted that lumbar spine films showed her Moss-Miami instrumentation to be intact and her bone mass to be visible. (R. at 403.)

On March 4, 2005, Ryan A. Tauzell, MAPT, reported that Bowen was performing her home exercise program approximately twice a day and that she was walking between ¼ mile and ½ mile every other day. (R. at 401.) Bowen reported lower back and feet pain bilaterally and paresthesias 100% of the time. (R. at 401.) Bowen rated her pain as a six on a 10-point scale and reported lower extremity cramping. (R. at 401.) Tauzell indicated that Bowen was unable to control eccentric

17

squat without upper extremity assistance because of significant bilateral lower extremity weakness and absence of reflexes. (R. at 401.) Tauzell recommended that Bowen continue with gym rehabilitation. (R. at 401.)

On March 8, 2005, Dr. Grubb reported that Bowen's pre-operative pain had diminished but that Bowen continued to have lower back pain and burning pain in her legs. (R. at 399.) Bowen also complained of leg cramps, foot cramps and bilateral anterior foot numbness. (R. at 399.) Standing, walking for an extended period, getting in and out of a car and weather changes continued to aggravate Bowen's pain, while lying down and taking medication alleviated her symptoms. (R. at 399.) Dr. Grubb's lower back examination revealed a normal gait, normal strength in the lower extremities and limited extension at Bowen's first metatarsophalangeal joints, limiting extension of her great toes. (R. at 400.) Dr. Grubb diagnosed Bowen with discogenic pain at the L4-L5 and the L5-S1 levels of the spine and isthmic spondylolisthesis at the L5-S1 levels of the spine. (R. at 400.) Dr. Grubb adamantly warned Bowen to quit smoking. (R. at 400.)

On March 23, 2005, Bowen attended physical therapy at VHOSC. (R. at 397.) Tauzell reported that Bowen had failed to attend any gym rehabilitation due to cost and unavailability of transportation. (R. at 397.) Bowen rated her lower back pain as a four on a 10-point scale and reported new symptoms of left buttock to mid calf muscle burning. (R. at 397.) Bowen also complained of a stiff back in the mornings. (R. at 397.) Bowen reported compliance with her home exercise program and indicated that she was walking about one mile a week. (R. at 397.) Tauzell noted that Bowen depended on her upper extremity strength to complete many of the exercises, but

18

reported increased strength in her lower extremities. (R. at 397-98.)

On April 12, 2005, Bowen continued her physical therapy at VHOSC. (R. at 395-96.) Bowen reported a "click" centrally at her incision site, which was painful when undergoing weight-bearing activities. (R. at 395.) Bowen reported her pain as a four on a 10-point scale in the mornings and as a 10 on a 10-point scale in the evenings. (R. at 395.) Bowen reported parasympathetic reactions to symptomatic increases, including nausea and vomiting. (R. at 395.) She informed Perry that her symptoms suddenly increased after walking more than 20 minutes, and that her increased pain caused her to decrease the frequency of her home exercise program. (R. at 395-96.) Perry reported difficulty with full range of motion exercises and questioned Bowen's compliance with her home exercise program. (R. at 396.) Perry also noted that Bowen's description of her pain level fluctuations appeared to be inconsistent in nature. (R. at 396.) Bowen was instructed to quit smoking, to take acetaminophen instead of ibuprofen and was given instructions for her home exercise program. (R. at 396.) Perry reported her rehabilitation potential as fair. (R. at 396.)

Bowen presented for a follow-up appointment at VHOSC on April 29, 2005. (R. at 391-94.) Dr. Grubb reported that Bowen's pain had diminished, but that she continued to have lower back pain and burning in her legs. (R. at 391.) Dr. Grubb noted that Bowen reported walking three to four times a day for a duration of about 20 minutes, and that she reported compliance with her home exercise program. (R. at 391.) Bowen reported that sitting and prolonged activities aggravated her pain, while lying down and applying heat and ice alleviated her pain. (R. at 391.) Bowen rated her pain as varying from two to five on a 10-point scale. (R. at 391.) Bowen reported

19

depression due to her inability to become active after surgery. (R. at 392.) Dr. Grubb's lower back examination revealed a normal gait, a normal toe walk and a decreased heel walk bilaterally. (R. at 392.) A straight leg raise test was positive for leg and back pain at 80 degrees. (R. at 393.) Lumbar x-rays taken on April 29, 2005, revealed that Bowen's Moss-Miami instrumentation was intact, and that her bone mass was visible. (R. at 393.) Dr. Grubb's diagnoses remained the same as reported at Bowen's prior visit. (R. at 393.) Bowen presented to VHOSC on May 5, 2005, and June 2, 2005, for physical therapy. (R. at 503-06.) She was instructed to continue her home exercise program. (R. at 503-06.)

Bowen returned to Dr. Grubb for another follow-up on June 16, 2005. (R. at 389-90.) Bowen complained that her symptoms had remained unchanged since her prior visit, and reported that she was very frustrated with her pain. (R. at 389.) She stated that her back "pops and cracks," and that she had fallen several times because she felt like "her legs just [were not] there." (R. at 389.) She reported that transitioning between positions, prolonged activities, bending, coughing and sneezing aggravated her pain, while sitting in a recliner alleviated her pain. (R. at 389.) She rated her worst pain as being a five on a 10-point scale, and she stated that it was present all day. (R. at 389.) She reported continued depression due to inactivity. (R. at 390.) Dr. Grubb's lower back examination revealed that Bowen was able to heel walk, toe walk and that strength in Bowen's lower extremities was within normal limits. (R. at 390.) Dr. Grubb's diagnoses remained the same, and Bowen was again instructed to quit smoking. (R. at 390.) On July 5, 2005, Bowen presented to Dr. Beres with continued complaints of lower back pain and insomnia. (R. at 457.) Dr. Beres prescribed imipramine and instructed Bowen to call if she did not notice improvement. (R. at 457.)

20

Bowen returned to Dr. Grubb on July 26, 2005, and continued to complain of lower back pain and bilateral leg pain. (R. at 468-70.) Bowen reported that the factors which aggravated her back pain included bending, coughing, sneezing, prolonged activities and transitioning. (R. at 468.) She also reported that sitting in a recliner alleviated her back pain. (R. at 468.) She rated her pain as a four on 10-point scale and stated that it was present all day. (R. at 468.) She also reported depression due to her inability to be as active as she was prior to surgery. (R. at 468.) Dr. Grubb noted that Bowen was able to heel and toe walk and that she was able to flex forward touching her fingertips to her knees but that flexion and extension were limited by back pain. (R. at 469.) Dr. Grubb reported Bowen's lower extremity strength to be within normal limits and noted that a straight leg raise test resulted in back pain and left leg pain at 90 degrees. (R. at 469.) Dr. Grubb also referenced lumbar x-rays dated July 26, 2005, and noted that the x-rays revealed that the L4-S1 levels of the spine instrumentation was intact, the bone mass was visible and there was no evidence of motion on the flexion and extension views. (R. at 469.) Dr. Grubb's diagnoses remained the same as reported at Bowen's previous visit. (R. at 469.) A telephone report dated August 22, 2005, indicated that Bowen called VHOSC, and stated that she was not happy with her progress and wanted to get a second opinion regarding her back. (R. at 467.)

Bowen presented to Dr. John Kavacich, M.D., on August 15, 2005, complaining of continued back pain and trouble functioning, such as frequent falls. (R. at 461, 487.) She also reported that she could feel and hear things pop in her back. (R. at 461, 487.) Dr. Kavacich noted tenderness to light palpation of the paravertebral muscles at the lumbosacral region, a diminished left lower extremity reflex and a negative straight leg

21

raise test. (R. at 461, 487.) Dr. Kavacich commented that he was not a back specialist, and subsequently referred her to Dr. Harin in Roanoke, Virginia. (R. at 461, 487.) Dr. Kavacich also saw Bowen on December 19, 2005, and diagnosed a reactive airways disease. (R. at 462.)

After being referred by Dr. Beres, Bowen presented to Carillion Neurosurgical Care, ("CNC"), on August 30, 2005, where she was treated by Dr. John C. Fraser, M.D. (R. at 443-45.) Dr. Fraser noted that Bowen complained of back pain and bilateral leg pain. (R. at 443.) Bowen reported that she felt "horrible" since her surgery due to pain in her back radiating to both legs, as well as crepitations and "clicks in her back when she move[d]." (R. at 443.) Dr. Fraser reviewed x-rays and an MRI brought in by Bowen and noted that he did not see an interbody fusion, but he could see evidence of a possible transverse process fusion. (R. at 443.) Bowen reported that physical therapy was prescribed, postoperatively, but that she could not tolerate the therapy, and discontinued it. (R. at 444.) Bowen complained that, "everything hurts from the waist down." (R. at 444.) Dr. Fraser noted weakness and numbness bilaterally in her legs and feet, and noted that a straight leg raise test was negative sitting and positive lying down. (R. at 444.) He also noted that Bowen was unable to walk on her heels, bilaterally, but he did not find any gross dorsiflexion weakness or extensor hallucis longus weakness on direct testing. (R. at 444.) He also noted that she was able to walk on her toes and do knee bends, but that she complained of pain with the normal maneuvers of his examination. (R. at 444.) Bowen refused to attempt to kneel from a chair and complained of feet pain upon touch. (R. at 444.) Dr. Fraser instructed Bowen to obtain more of her records and ordered additional tests to be completed before she returned. (R. at 444.)

22

A CT scan of Bowen's lumbar spine, performed at WCCH on September 22, 2005, revealed a mild concentric disc bulge and a slight mass effect on the thecal sac at the L2-L3 levels of the spine, some mild narrowing of the right foramen secondary to bony intrusion from a posterior fusion mass at the L4-L5 levels of the spine, a very mild concentric disc bulge at the L4-L5 levels of the spine, a probable mass effect on the right L4 nerve root as it exits and disc space narrowing and Grade II anterolisthesis with apparent bilateral pars interarticularis defects at the L5-S1 levels of the spine. (R. at 420-21.) A lumbar myelogram on the same date revealed a borderline Grade II anterolisthesis at the L5-S1 levels of the spine with disc space narrowing and a small-to-moderate ventral extradural defect with some mass effect on the thecal sac at the L2-L3 levels of the spine. (R. at 421.) Bowen was seen at the WCCH ER on September 26, 2005, complaining of a possible migraine headache, for which she was diagnosed and treated.[5] (R. at 424-29.)

Bowen again reported to Dr. Fraser on September 29, 2005. (R. at 441.) Dr. Fraser noted that a myelogram revealed some fusion bone impinging on the foramen at the L4-L5 levels of the spine. (R. at 441.) He also reported that an electromyograph, ("EMG"), was normal. (R. at 441.) Dr. Fraser opined that he did not see any progression in Bowen's spondylolisthesis, and that her neurological exam was unchanged. (R. at 441.) Further, Dr. Fraser did not recommend surgical intervention, and he opined that the modest abnormality reported on Bowen's post myelogram CT scan would not explain her hypersensitive feet or her symptoms of pain from the waist down bilaterally. (R. at 441.) He also noted that the EMG did not show any evidence

---

[5]The ER records on this date are mostly illegible.

of nerve injury, and the myelogram films that he reviewed did not show any evidence of nerve root injury. (R. at 441.) Dr. Fraser further noted that he felt Bowen's fusion needed more time to mature before he saw her again. (R. at 441.)

Bowen returned to Dr. Grubb on January 12, 2006, for a follow-up visit regarding her back pain. (R. at 464-66.) Dr. Grubb noted that Bowen's symptoms were unchanged since the last visit, and that she was walking and performing exercises prescribed by physical therapy. (R. at 464.) Bowen reported that transitioning, prolonged activities, bending, coughing and sneezing aggravated her pain and that sitting in a recliner and applying heat or ice helped to alleviate her pain. (R. at 464.) She also reported that her pain varied from six to 10 on a 10-point scale and that it was present all day. (R. at 464.) Dr. Grubb noted that her pain caused moderate interference with normal household activities, and that she had insomnia secondary to pain. (R. at 465.) He found Bowen's strength to be within normal limits in her lower extremities. (R. at 465.) Dr. Grubb also referenced lumbar x-rays dated January 12, 2006, and noted that the x-rays revealed that the L4-S1 levels of the spine instrumentation was intact, the bone mass was visible and there was no evidence of motion on the flexion and extension views. (R. at 465.) Dr. Grubb also noted that a myelogram and a post myelogram CT scan ordered by Dr. Beres in September 2005, revealed good fusion mass, but immature development at the L4-L5 levels of the spine, a limited fusion mass at the L5-S1 levels of the spine with no root compression and that her instrumentation was in place. (R. at 465.) Dr. Grubb scheduled Bowen for a thoracolumbar discogram and post discogram CT scan in order to better define the cause of Bowen's pain. (R. at 465.)

24

A consultative examination by Dr. Kovacich dated March 8, 2006, revealed that Bowen's heel and toe walking was mildly distorted, that she walked favoring her left lower extremity and that her gait was somewhat antalgic in nature. (R. at 471.) Dr. Kovacich reported that Bowen had one to two asthma attacks daily as a result of continued smoking, but that there was no wheeze present during his examination. (R. at 471.) Dr. Kovacich performed a straight leg raise test, which was negative at 90 degrees bilaterally, and he opined that Bowen's range of motion was normal, with the exception of her range of motion in the dorsolumbar spine. (R. at 472.) Dr. Kovacich diagnosed a reactive airways disease, which he stated was stable. (R. at 471.) He also diagnosed chronic lower back pain, which was discogenic in nature, and was accompanied by persistent chronic pain and limitation of motion. (R. at 471.)

On March 20, 2006, Bowen reported shortness of breath to Dr. Kovacich. (R. at 484.) She was diagnosed with a reactive airways disease as a result of tobacco use. (R. at 484.) On June 6, 2006, Bowen presented to Dr. Anne DeLanoy, M.D., of the Front Royal Family Practice, ("FRFP"), with chief complaints of back pain and asthma. (R. at 479.) She reported that her pain was aggravated by exertion, prolonged standing and sitting and that her symptoms were relieved by lying down. (R. at 479.) Dr. DeLanoy noted that Bowen had normal muscle strength in both lower extremities, with no impairment of tandem walking, walking on toes or walking on heels. (R. at 481.) She also noted pain with flexion and extension of the spine, paraspinous muscle spasms and tenderness over Bowen's sacroiliac region. (R. at 481.) A spirometry report on June 14, 2006, revealed normal responses and was otherwise unremarkable. (R. at 494.) An MRI performed on June 16, 2006, revealed an artifact from pedicle screws at the L3-L4 and L4-L5 levels of the spine, no obvious focal disc herniation or spinal stenosis and a

25

mild right paracentral disc bulge at L2-L3. (R. at 493.) The MRI also revealed that the neural foramina were not well visualized and that foraminal narrowing could not be excluded. (R. at 493.) Bowen returned to FRFP on June 28, 2006, for a follow-up regarding her asthma, and she was again advised to stop smoking. (R. at 475.)

Bowen presented to the Department of Neurological Surgery at the University of Virginia on June 21, 2006, and reported that she continued to have back pain and bilateral leg pain, which was alleviated by sitting and by using heating pads. (R. at 491.) Dr. Jason P. Sheehan, M.D., reported that Bowen's cranial nerves II-XII appeared grossly intact. (R. at 491.) He also noted that she had 4/5 strength in her right leg and 4/5 strength in the left leg, which appeared to be effort dependent. (R. at 491.) She had normal bulk and tone and slightly decreased sensation to light touch in the left lateral leg. (R. at 491.) Dr. Sheehan also reported that an outside MRI was significant for pedicle screw placement at the L3-L4 and L4-L5 levels of the spine; and that it revealed no apparent focal disc herniation, a mild right paracentral disc bulge and Grade I spondylolisthesis at L5 on S1. (R. at 491.) Dr. Sheehan stated that he would not recommend any additional decompression or discectomy. (R. at 491.) X-rays of the lumbar spine dated June 21, 2006, revealed no abnormal motion between flexion and extension, a Grade II anterolisthesis of L5 on S1 and postoperative changes of the L4 through the S2 levels of the spine posterior fusion. (R. at 567.) On June 26, 2006, Dr. Sheehan reviewed flexion and extension films on Bowen and found no evidence of abnormal motion in her lower lumbar spine or upper sacrum. (R. at 489, 568.) Dr. Sheehan continued to recommend no surgical intervention and referred Bowen to Dr. William J. Elias, M.D.. (R. at 489, 565-66, 568.)

On July 28, 2006, Dr. Elias examined Bowen. (R. at 563-64.) He reported that her examination was notable for hypoactive reflexes at the knees and ankles, and a diminished pin sensation was noted throughout both of her legs in all distributions. (R. at 563.) He also noted that Bowen exhibited giveaway weakness in both legs, including dorsiflexion, extensor hallucis longus and plantar flexion bilaterally. (R. at 563.) Further, he indicated that Bowen was able to ambulate on her heels and her toes. (R. at 563.) Dr. Elias reviewed Bowen's MRI's and noticed Grade I spondylolisthesis at L5-S1 and no evidence of nerve root compression. (R. at 563.) He also reviewed Bowen's x-rays, which revealed pedicle screws at L4 and deep in the sacrum at S2 and no movement on the flexion and extension views. (R. at 563.) He advised Bowen that further surgery was not necessary and that she was to continue to work on lumbar strengthening and flexibility. (R. at 563-64.)

Dr. Huntington T. Hapworth, M.D., saw Bowen on September 1, 2006, for complaints of chronic lower back pain that radiated into both legs, the left being worse than the right. (R. at 555-59.) She reported that her pain had been unchanged since before her back surgery. (R. at 555.) Bowen also reported that her only progress had been a sense of improvement with her intermittent leg weakness. (R. at 556.) Dr. Hapworth noted that her upper extremities had normal strength and range of motion. (R. at 558.) He also noted that her thoracic spine was without kyphosis or scoliosis and that she had no paraspinal muscle spasms. (R. at 558.) In addition, a sitting straight leg raise test was negative bilaterally. (R. at 558.) Dr. Hapworth reported that Bowen's lumbosacral spine was "exquisitely tender to light palpation which minimizes with distraction techniques." (R. at 558.) He later noted "apparent amplification of symptoms." (R. at 558-59.) A Faber exam was positive bilaterally with pain produced

27

in the sacroiliac distribution. (R. at 558.) Dr. Hapworth also noted that her lower extremities were intact with a normal range of motion and some limitation only by pain. (R. at 558.) He noted that her cranial nerves II through XII were intact with a decreased fine touch sensation from the lower mid calf muscles distally in her bilateral lower extremities. (R. at 558.) He also noted decreased pin prick sensation throughout the foot, mild allodynia noted on the dorsum of bilateral feet to light touch and a decreased proprioception in her bilateral lower extremities. (R. at 558.) Dr. Hapworth diagnosed her with chronic lower back pain with radicular extremity discomfort and neuropathic lower extremity pain in a stocking glove distribution in her bilateral lower extremities. (R. at 558-59.)

Bowen presented to Dr. Robert B. Goldstein, M.D., on September 21, 2006, with a chief complaint of lower back pain. (R. at 549-50.) Bowen complained of paresthesias and described her pain as sharp and burning with occasional radiation to her left lower extremities. (R. at 549.) She reported that her pain became worse with walking and prolonged sitting and standing, and she experienced burning on the top of her feet bilaterally. (R. at 549.) Dr. Goldstein noted point tenderness, bilaterally over the sacroiliac joints. (R. at 549.) He also noted that she was positive, bilaterally for the Patrick test, and she had a negative straight leg raise test bilaterally. (R. at 549.) He noted that her strength was four out of five bilaterally in her hip flexors, knee extensors and ankle dorsiflexors. (R. at 549.) Dr. Goldstein noted hyperalgesia and allodynia over the dorsum over the feet, bilaterally. (R. at 549.)

A psychological evaluation was completed by Brian E. Warren, Ph.D., a licensed clinical psychologist, on November 8, 2006. (R. at 541-46.) Bowen reported that she

28

took medications for the treatment of sleep difficulty, asthma and pain associated with back injury. (R. at 541.) Bowen also reported that her chief complaints were with managing and coping with constant pain, adjusting to her inability to work, her nervousness and depression. (R. at 542.) Bowen described constant pain in her lower back, buttocks, legs, feet and toes and stated that she could not stand, sit, walk or lift without increasing pain. (R. at 542.) Warren described her mood as depressed, sullen, irritable and somewhat hostile and guarded with a blunted affect. (R. at 542.) Warren also reported that she appeared fatigued and showed signs of psychomotor retardation. (R. at 542.) Bowen reported continuous and persistent depression that had lasted for at least three years. (R. at 542.) She reported that she felt hopeless, useless and guilty about not working. (R. at 543.) She denied any thoughts of suicide. (R. at 543.) Bowen also reported that she could not maintain concentration. (R. at 543.) Warren noted that Bowen's daily activities were limited by her physical complaints and her depression, and that she no longer performed regular housework or chores. (R. at 543.)

A Personality Assessment Inventory, ("PAI"), was administered to Bowen by Warren. (R. at 543-46.) Warren noted that Bowen responded in a consistent and forthright manner and that her clinical profile was marked by significant elevations with clear evidence of clinical features that were likely interfering with her functioning. (R. at 543.) In general, Warren noted that her profile indicated an extremely depressed person with marked moodiness and tension. (R. at 543-44.) He noted low energy, social withdrawal, social isolation, feelings of sadness, loss of normal interests, loss of pleasure in daily living, a great deal of tension and difficulty relaxing. (R. at 544.) Warren concluded that the PAI indicated significant depressive experiences with thoughts of hopelessness and personal failure. (R. at 544.) The WAIS-III was

Case 1:07-cv-00082-GMW-PMS   Document 14   Filed 06/17/08   Page 29 of 37   Pageid#: 657

administered to Bowen, who achieved a verbal intelligence quotient, ("IQ"), score of 79, a performance IQ score of 77 and a full-scale IQ score of 76. (R. at 544-45.) According to Warren, Bowen would have extreme difficulty coping with any stress and pain and could not relate effectively with peers or supervisors at the present time. (R. at 545.) Warren diagnosed Bowen with major depressive disorder, recurrent, severe, and depressed intellectual functioning. (R. at 545-56.)

Warren completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) on November 9, 2006. (R. at 547-48.) Warren opined that Bowen would have a moderate limitation in her ability to understand, remember and carry out short, simple instructions, a severe limitation in her ability to understand, remember and carry out detailed instructions and a marked limitation in her ability to make judgments on simple work-related decisions. (R. at 547.) He also opined that Bowen would have a marked limitation in her ability to interact appropriately with the public and to respond appropriately to work pressures in a usual work setting, an extreme limitation in her ability to interact appropriately with her supervisors and co-workers and a moderate limitation in her ability to respond appropriately to changes in a routine work setting. (R. at 548.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. § 416.920 (2007); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). The process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe

30

impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 416.920 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2007).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated May 24, 2007, the ALJ denied Bowen's claim. (R. at 13-25.) After consideration of the entire record, the ALJ found that Bowen had not engaged in substantial gainful activity since her alleged onset of disability. (R. at 24.) The ALJ found that the medical evidence established that Bowen had severe impairments, namely degenerative disc disease with lumbar fusion and migraine headaches, but he also found that Bowen's medically determinable impairments did not meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 24.) The ALJ concluded that Bowen's allegations regarding her limitations were not entirely credible. (R. at 24.) Furthermore, the ALJ determined that Bowen retained the

residual functional capacity to perform a significant range of light work that did not involve exposure to hazards and did not require climbing ladders, ropes or scaffolds. (R. at 24.) The ALJ also found that the limitations imposed by Bowen's impairments might not preclude performances of her past relevant work as a waitress or photo processor, but that her past relevant work skills were not transferable to other jobs within her residual functional capacity. (R. at 24.) Based on Bowen's age, education and work history, and using Medical Vocational Rule 202.21, 20 C.F.R. Part 404, Subpart P, Appendix 2, as a framework for his decision, the ALJ found that Bowen was capable of performing a significant number of jobs existing in the national economy, such as a cashier, assembler and/or mail clerk. (R. at 25.) Based on these findings, the ALJ determined that Bowen was not under a "disability" as defined by the Act and, thus, was not eligible for SSI benefits. (R. at 25.) *See* 20 C.F.R. § 416.920(g) (2007).

Bowen argues that the ALJ erred in failing to provide adequate rationale for his conclusion that Bowen did not have a severe mental impairment, and in particular, that he did not provide adequate rationale for his rejection of the psychological exam performed by Brian E. Warren, Ph.D. (Brief in Support of Plaintiff's Motion for Summary Judgment, ("Plaintiff's Brief"), at 1-2, 19-20.) In addition, Bowen argues that the ALJ erred by using his own, unqualified medical and psychological opinions. (Plaintiff's Brief at 2, 23.) Lastly, Bowen argues that the ALJ erred by failing to consider the synergistic effects of her impairments. (Plaintiff's Brief at 2, 20-23.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the

Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate that he has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979.) While an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Bowen's first argument is that the ALJ erred in failing to provide adequate rationale for his conclusion that Bowen did not have a severe mental impairment, and in particular, that he did not provide adequate rationale for his rejection of the psychological exam performed by Brian E. Warren, Ph.D. (Plaintiff's Brief at 1-2, 19-20.) The undersigned is of the opinion that the ALJ provided sufficient rationale for his conclusion regarding the absence of a mental impairment and his rejection of Warren's examination results. First, the ALJ noted that there is no evidence that Bowen sought

33

treatment from a mental health professional prior to her evaluation, but rather, did so only after the hearing. (R. at 21.) Secondly, the ALJ pointed out that there is no evidence that Bowen has ever had any episodes of decompensation. (R. at 21.) Thirdly, the ALJ pointed out that Bowen's counsel did not list a mental impairment in his Pre-Hearing Memorandum. (R. at 22.) Fourth, the ALJ pointed out that Bowen failed to allege any mental impairment when filing for disability. (R. at 22.) And lastly, and most importantly, the ALJ provided a thorough discussion of Warren's assessment. (R. at 21.) The ALJ stated that, in reaching the conclusion that Bowen does not have a severe impairment, he

> . . . is not unmindful of the extremely restrictive medical assessment provided by Dr. Warren in November 2006 . . . . Although Dr. Warren has examined claimant, it must be noted that he did so on only one occasion in an evaluation arranged by [Bowen's attorney] for the purpose of enhancing claimant's application for Supplemental Security Income payments. There is no evidence that he considered entering into a treatment relationship with claimant. Although Dr. Warren is a licensed clinical psychologist, his opinion is not fully supported by his own clinical findings and, perhaps more importantly, is inconsistent with the evidence of record showing that [Bowen] has never sought ongoing treatment from a mental health professional and her depression was described as "mild" in September 2006 by the examining UVA physician . . . . Thus, the medical assessment rendered by Dr. Warren in November 2006 is accorded very little weight.

(R. at 21-22.) Thus, it is clear that the ALJ provided this court with adequate rationale for his decision regarding Bowen's mental residual functional capacity and his decision to discount Warren's assessment.

Bowen's second argument is that the ALJ erred by using his own, unqualified

34

medical and psychological opinions. (Plaintiff's Brief at 2, 23.) The court disagrees. While it is the case that, "in the absence of any psychiatric or psychological evidence to support his position, the ALJ simply does not possess the competency to substitute his views on the severity of [a claimant's] psychiatric problems for those of a trained professional," that is not the situation in this case. *See Grimmett v. Heckler*, 607 F. Supp. 502, 503 (S.D. W. Va. 1985) (citing *McLain v. Schweiker*, 715 F.2d 866, 869 (4th Cir. 1983); *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). The ALJ relied on Dr. Goldstein's assessment that Bowen's depression was only mild. (R. at 22.) Further, he also relied on the absence of any severe mental impairment diagnoses. This case is unlike *Grimmett v. Heckler*, 607 F. Supp. 502, 503 (S.D. W. Va. 1985), in which the claimant had diagnoses of "atypical organic brain syndrome with severe impairment; borderline intellectual functioning; generalized anxiety disorder, chronic, moderate to moderately severe; and psychological factor affecting physical condition." In that case, severe diagnoses unaccompanied by treatment were considered to be improperly discredited without psychiatric and psychological evidence to the contrary or without the testimony of a medical expert. *Grimmett*, 607 F. Supp. at 503. The ALJ in this case did not discredit psychiatric and psychological evidence, as such evidence is entirely absent from the record, with the exception of Dr. Warren's opinion, for which the ALJ provided adequate rationale for not accepting. In *Grimmet*, there was an absence of treatment for diagnosed serious impairments. In this case, there is an absence of treatment as well as an absence of *any* serious diagnoses. Moreover, because there is sufficient evidence for the ALJ to make a decision on Bowen's mental capabilities, he was not required to order a consultative examination. *See* 20 C.F.R. § 416.919a (2007).

35

Thirdly, Bowen argues that the ALJ erred by failing to consider the synergistic effects of her impairments. (Plaintiff's Brief at 2, 20-23.) With respect to this argument, the undersigned finds that the ALJ conducted a thorough review of Bowen's impairments, both singly and in combination. The ALJ's opinion thoroughly discussed Bowen's psychological symptoms, migraine headaches, lower back pain, leg pain and asthma. (R. at 18-24.) In reaching his decision, the ALJ discussed and considered the credibility of Bowen, her statements made at the hearing regarding her symptoms and the effects of her symptoms, including pain, on her ability to work. (R. at 13-24.) Moreover, in assessing Bowen's residual functional capacity, the ALJ incorporated all limitations which he had determined were supported by the record, specifically limiting Bowen based on both her lower back symptoms and her migraine headaches. (R. at 23.) The ALJ's discussion of Bowen's impairments is more than adequate to show that he has considered the combined effect of Bowen's impairments and to allow for proper judicial review. *See Reichenbach v. Heckler*, 808 F.2d 309, 312 (4th Cir. 1985)

## V. Conclusion

For these reasons discussed above, I will sustain the Commissioner's motion for summary judgment and decision to deny benefits, and I will overrule Bowen's motion for summary judgment.

An appropriate order will be entered.

DATED: This 17th day of June, 2008.

Case 1:07-cv-00082-GMW-PMS Document 14 Filed 06/17/08 Page 36 of 37 Pageid#: 664

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE

37